**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

RONALD VERNON
CHAMBERLIN,

                              CASE NO. 4:19-cv-10412

        *Plaintiff*,         DISTRICT JUDGE STEPHANIE DAWKIN DAVIS

*v.*                       MAGISTRATE JUDGE PATRICIA T. MORRIS

COMMISSIONER OF SOCIAL
SECURITY,

        *Defendant.*
_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 12, 16)

## I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports Defendant Commissioner of Social Security's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment, (ECF No. 12), be **DENIED**, the Commissioner's Motion, (ECF No. 16), be **GRANTED**, and the Commissioner's final decision denying benefits be **AFFIRMED**.

## II.    REPORT

### A.    Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Referral, (ECF No. 18), this case was referred to me to review the Commissioner's final decision denying Plaintiff's claim for Title II Disability Insurance Benefits (DIB). The case

1

is presently before the Court upon the parties' cross-motions for summary judgment. (ECF Nos. 12, 16.)

Plaintiff filed his present application for DIB in March 2015, alleging that his disability began December 31, 2012. (ECF No. 10 at PageID.293). The application was initially denied on July 28, 2015. (*Id*. at PageID.174-190). Plaintiff then requested a hearing before an Administrative Law Judge (ALJ), (*Id*. at PageID.191-92), which occurred on August 31, 2017. (*Id*. at PageID.91-139). The ALJ issued a decision on September 26, 2017, finding Plaintiff not disabled during the relevant period. (*Id*. at PageID.63-84). On December 10, 2018, the Appeals Council denied review, (*Id*. at PageID.44-46), and Plaintiff filed for judicial review on February 11, 2019. (ECF No. 1). He moved for summary judgment on June 7, 2019. (ECF No. 12), and the Commissioner countered with its own Motion two months later, (ECF No. 16). The case is now ready for resolution.

### B.      Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F App'x. 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).

2

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id*. at 286 (internal citations omitted).

### C. Framework for Disability Determinations

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. § 1382c(a)(3)(A). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

> (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.
>
> (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.
>
> (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)). The RFC "is the most [the claimant] can still do despite [his or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20

4

C.F.R. § 404.1545(a)(2).

### D.    ALJ Findings

Following the five-step sequential analysis, the ALJ determined that Plaintiff was not disabled from March 8, 2013 to the date of the decision. (EFC No. 10 at PageID.63-83). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since March 8, 2013, the day after the date of the prior decision, which also found Plaintiff not disabled. (*Id.* at PageID.69). At step two, the ALJ concluded that Plaintiff had the following severe impairments: "mild degenerative disc disease of the cervical spine and thoracic spine; partial and full thickness tears in the shoulder tendons; obstructive sleep apnea; obesity; affective disorder; anxiety; and attention deficit disorder." (*Id.*). At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that "meet or medically equals the severity" of a listed impairment. (*Id.* at PageID.70).

Before proceeding to the final steps, the ALJ found that Plaintiff had the residual functional capacity (RFC) to perform

> sedentary work as defined in 20 CFR 404.1567(a) except the claimant can lift and/or carry no more than ten pounds at a time and may occasionally lift or carry articles such as docket files, ledgers, and small tools. He can stand and/or walk for six hours and sit for six hours during a normal eight-hour workday. The claimant can frequently push, pull, and use hand controls and reach with the right upper extremity. However, he is unable to reach overhead or to shoulder height with the right upper extremity. The claimant may occasionally climb ladders, but may never climb ropes or scaffolds. He can occasionally kneel, crouch, and crawl. The claimant may have occasional interaction with the public. He is able to carry out simple instructions.

(*Id.* at PageID.73). At step four, the ALJ found Plaintiff unable to perform any past relevant

work. (*Id*. at PageID.81). At sept five, the ALJ determined that, considering Plaintiff's age, education, work experience, and RFC, jobs existed in significant numbers in the national economy that Plaintiff could perform. (*Id*. at PageID.82).

### E.  Administrative Record

#### 1.  Medical Evidence

On June 8, 2012, Plaintiff saw Dr. Mitchel Osman; while the treatment notes are difficult to decipher, they mentioned his children and past marriages. (ECF No. 10 at PageID.378). One note discussed Plaintiff's history with his Arnold Chiari malformation, for which he had decompression surgery; the note also mentioned that Plaintiff had fatigue from Lyrica and that he had night terrors, during which he woke up screaming. (*Id*. at PageID.380). Another note mentioned Plaintiff's social anxiety and depression. (*Id*. at PageID.382).

On May 6, 2013, Plaintiff visited the University of Michigan Ataxia clinic to be seen by Vikram Shakkottai, MBBS; Plaintiff noted continued significant pain in his right shoulder and tingling and numbness over his right arm. (*Id*. at PageID.419). Dr. Shakkottai noted that Plaintiff had a prior EMG and nerve conduction study in December 2010, which showed improved proximal to distal denervation with chronic reinnervation; Plaintiff noted he was no weaker than he was the last time he had been evaluated. (*Id*.). Plaintiff told Dr. Shakkottai that he remained physically active. (*Id*.). The physical exam indicated that Plaintiff was not in distress; his motor strength was 5/5 in upper and lower extremities; he had reduced sensation over the lateral border of his anterior right forearm and over his deltoid; his coordination showed normal nose-to-finger; his reflexes were 2+ in the upper

and lower extremities; and his gait was narrow-based and he could perform tandem gait with no difficulty. (*Id*. at PageID.420).

Plaintiff saw Beth Weaver, FNP, on May 14, 2013; he complained of diffusely located shoulder pain that he described as aching, chronic, gradual in onset, and moderately limiting his activities. (*Id*. at PageID.476). Review of systems indicated Plaintiff had difficulty sleeping, fatigue, shoulder pain, and tremors. (*Id*.) The physical examination showed Plaintiff was in no acute distress, had decreased abduction and adduction in his right shoulder and that his mood was depressed. (*Id*. at PageID.477).

On June 13, 2013, Plaintiff followed up with NP Weaver and presented with depression triggered by family stressors and the financial stressor of having to close down his business; review of systems showed he had difficulty sleeping, improved fatigue, back pain, neck pain, shoulder pain, depression, and anxiety. (*Id*. at PageID.480). The physical exam revealed decreased flexion of the cervical spine and decreased abduction and adduction in his right shoulder. (*Id*. at PageID.481).

On July 17, 2013, Dr. Osman noted that Plaintiff had a difficult time with not being able to do anything, that Plaintiff reported feeling sad all the time, and that he had increased sleep and decreased energy. (*Id*. at PageID.384). Plaintiff's chief complaint was decreased concentration. (*Id*. at PageID.385).

On October 1, 2013, Plaintiff presented to NP Weaver with chronic nausea, which he noted had begun several months prior; review of systems showed Plaintiff had fatigue but denied difficulty sleeping, nasal congestion and drainage, nausea, diarrhea, heartburn, productive cough, wheezing, back pain, and depression, although the medication helped

7

alleviate the depression. (*Id*. at PageID.483). In the physical examination, NP Weaver noted that Plaintiff had decreased flexion and extension of the cervical spine, decreased flexion in the lumbar spine, and obesity. (*Id*. at PageID.484).

On January 30, 2014, Plaintiff saw NP Weaver complaining of aching, chronic pain in his right shoulder; review of systems showed he had difficulty sleeping, fatigue, weight gain, heartburn, neck pain, shoulder pain, and depression. (*Id*. at PageID.487). The physical examination indicated decreased abduction, decreased adduction, and crepitus in Plaintiff's right shoulder. (*Id*. at PageID.488).

The following day, Plaintiff underwent a radiograph of his right shoulder which revealed mild widening of Plaintiff's AC (acromioclavicular) joint; the radiograph of his left shoulder showed minimal AC joint osteoarthritis. (*Id*. at PageID.405-406).

On February 21, 2014, Plaintiff visited Molly Minard, PA-C, complaining of bilateral shoulder pain rating 8 out of 10, worse on the right than left. (*Id*. at PageID.399). Plaintiff reported that he had gotten used to the pain and could not tell if it had worsened; the examination showed mild limitation in full flexion, no impingement with elevation, a negative Kennedy Hawkin sign, weak grip strength on his right, mildly limited internal and external rotation, and a positive Tinel's sign. (*Id*. at PageID.400).

On March 5, 2014, Dr. John Blocksom noted Plaintiff's severe carpal tunnel and that he had sensory loss throughout his hands; he predicted "improvement with the nocturnal numbness however we are unlikely to undue [*sic*] any neurologic damage that has set in up to this point." (*Id*. at PageID.397-398). On March 13, Dr. Blocksom performed a carpal tunnel release surgery on Plaintiff's left wrist. (*Id*. at PageID.402).

On March 24, 2014, Plaintiff returned to Dr. Blocksom and PA Minard; he reported "significant improvement in his symptoms." (*Id*. at PageID.395).

On April 23, 2014, Plaintiff returned to Dr. Blocksom and PA Minard, who noted that Plaintiff had a well-healed scar on his left wrist and that he was "back to work without restriction and overall doing well." (*Id*. at PageID.393).

In November 2014, Plaintiff went to the emergency room with a complaint of arm pain; the MRI of his shoulder joint indicated a mild bony spurring and widening along the AC joint, which was "unchanged from the January 2014 x-ray." (*Id*. at PageID.444-447). Other findings included no acute fracture, no dislocation, and no cortical erosion. (*Id*. at PageID.444).

On December 19, 2014, Plaintiff presented to NP Weaver with diffuse shoulder pain, worse on the right than the left. (*Id*. at PageID.491). Review of systems showed Plaintiff had fatigue, difficulty sleeping, weight gain, headache, back pain, neck pain, shoulder pain, and depression (he noted Zoloft helped). (*Id*.). The physical examination indicated that Plaintiff was in acute distress secondary to pain; decreased cervical spine flexion and extension with crepitus; decreased and painful adduction and abduction in his right shoulder. (*Id*. at PageID.492). On December 23, 2014, Plaintiff underwent an MRI of his right shoulder, which revealed the following: a "massive" full-thickness tear in the supraspinatus and infraspinatus tendons that had developed since the prior examination; moderate subacromial subdeltoid bursitis, and partial-thickness tears in the intracapsular portion of his biceps tendon and subscapularis tendon. (*Id*. at PageID.442).

On January 13, 2015, imaging of Plaintiff's right shoulder suggested a rotator cuff

tendon tear and mild glenohumeral osteoarthritis. (*Id*. at PageID.418).  The same day, Plaintiff saw Dr. Bedi and Michael Walsh, PA-C at University of Michigan Medical Center; PA Walsh noted that Plaintiff's shoulder was "reasonably stable up until this last autumn when he had an insidious onset in pain." (*Id*. at PageID.420). Plaintiff's more recent MRI showed a "massive atrophic and retracted rotator cuff tear as well as some early elevation of his humeral head." (*Id*.). PA Walsh noted that Plaintiff had "maintained reasonably good function in terms of range of motion, but [had] trouble lifting anything out away from his body or up over his head." (*Id*. at PageID.420-421). PA Walsh further noted that the exam of Plaintiff's right shoulder demonstrated 180 degrees of forward flexion, external rotation to barely past neutral, internal rotation to PSIS; he had 4- to 3+ out of 5 strength with cuff testing; and his axillary, medial, radial, and ulnar nerve distributions were intact. (*Id*. at PageID.420). Dr. Bedi then noted Plaintiff's massive rotator cuff tear as well as early cuff arthropathy which was likely unrepairable; he further noted Plaintiff seemed "quite young to be considering a reverse total shoulder arthropathy" but that Plaintiff had maintained good function in terms of his range of motion. (*Id*.).

On January 27, 2015, Dr. Osman noted that Plaintiff reported the Adderall was working well. (*Id*. at PageID.435). Further, Dr. Osman noted in Plaintiff's mental status exam that he had new health issues and that medication risks and benefits had been discussed but was negative for self-harm, alcohol and drug use, sleep issues, appetite issues, medication side effects, and weight change; he was well dressed, well groomed, disheveled, overweight, distressed, worried, cooperative, agitated; his thoughts were organized and coherent; his mood was euthymic and affect appropriate; and his cognition

was within normal limits. (*Id*. at PageID.437).

On June 11, 2015, Plaintiff was evaluated by psychological consultative examiner George Pestrue, Ph.D. (*Id*. at PageID.497-502). Plaintiff discussed his pain, depression, ADD, and anxiety disorders; he noted he got serious headaches lasting 6 to 12 hours 2 to 3 times a month; he had social anxiety and did not like being around people, noting that he became nauseous, dizzy, and sweaty in social situations; he had difficulty concentrating; he was sad 75 percent of the time and cried several times a week; and he had depression and low self-esteem but had not had suicidal ideations. (*Id*. at PageID.497). He noted the onset of depression was 2003 when his wife left him and that while the Zoloft helped, he still felt depressed. (*Id*. at PageID.498). Plaintiff noted he had always had difficulty concentrating and had to reread things five or six times to comprehend them; he reported that taking Adderall helped him concentrate. (*Id*.). Dr. Pestrue noted Plaintiff was taking Lyrica, Adderall, Zoloft, Norco, and Prilosec at the time. (*Id*.). Regarding social functioning, Plaintiff noted that he got along well with his neighbors and had "about eight good friends," half of whom he saw regularly; Dr. Pestrue noted Plaintiff related to him in a friendly and cooperative manner. (*Id*. at PageID.499). Plaintiff noted that on a typical day, he woke up by 8:30 or 9:00, walked his dog, watched television, played with his son as much as possible, and did 50 percent of the cooking in the house. (*Id*.). Generally, Dr. Pestrue observed that Plaintiff's dress was appropriate and clean; his hygiene was good; his gait appeared to be unimpaired; his facial expression was alert but moderately depressed; and his speech in tone, pace, and volume was appropriate and his articulation was clear. (*Id*. at PageID.500). Dr. Pestrue noted that Plaintiff had adequate contact with

11

reality, poor self-esteem, showed fair insight in status; his general motivation for many of life's usual activities appeared to be "significantly limited in scope." (*Id*.). His responses to questions were generally reasonable and he was a "good historian for personal information"; he appeared moderately depressed and his affect was flat; and he did not appear anxious, tense, or angry. (*Id*.). During the sensorium and mental capacity portion of the evaluation, Plaintiff could repeat five digits forward and three backwards; he could list United States Presidents in reverse chronological order; he could name five large cities with moderate speed; he could identify five celebrities and current events; and he could do math calculations with moderate speed. (*Id*. at PageID.501). Dr. Pestrue gave a guarded prognosis: he opined that Plaintiff's social anxieties will make it difficult for him to work in social situations, that his depression left him tired and lacking in motivation, and that he had difficulty focusing and concentrating on tasks. (*Id*. at PageID.502).

On June 22, 2015, state agency consultant Dr. Barbara Jones Smith, Ph.D., reviewed the evidence. (*Id.* at PageID.160, 163-165). Among other findings, she assessed moderate limitations in maintaining concentration, persistence, or pace. (*Id.* at PageID.160). She concluded, however, that Plaintiff "retains the mental residual capacity to perform step one/two tasks on a sustained basis." (*Id.* at PageID.165).

On June 25, 2015, Plaintiff saw orthopedist Jerome Ciullo, M.D. for a second opinion about whether he needed a "total reverse shoulder." (*Id*. at PageID.505). The examination showed that supraspinatus strength against resistance was 5 out of 5, which was "remarkable;" he could elevate his arm to 60 degrees of forward flexion, and 140 degrees of lateral abductions with some pain in midrange abduction; and he lacked 15

degrees of external rotation, 30 degrees of external rotation with the arm at the side, and 35 degrees of internal rotation at 90 degrees of abduction. (*Id*.). X-rays showed Plaintiff had glenohumeral arthritis which was narrowing but still relatively round; no major superior migration of the humeral head; and the top of the humeral head appeared to be even with the coracoid. (*Id*.). Dr. Cuillo noted Plaintiff was "obviously too young to talk about a reverse total shoulder" and suggested fixing the superior labrum and repairing the massive rotator cuff tear. (*Id*.). Further, he noted Plaintiff needed to weigh 175 pounds or less to qualify for the surgery. (*Id*.).

On July 13, 2015, Plaintiff saw Dr. Osman, who noted a sleep issue; Plaintiff was well-dressed, relaxed, well-groomed, cooperative, and calm; his affect was appropriate, and his mood was euthymic; and his thoughts were coherent and organized. (*Id*. at PageID.598).

On November 17, 2015, Plaintiff saw NP Weaver and complained of left shoulder pain that moderately limited activity; the physical exam showed decreased abduction with pain and decreased adduction. (*Id*. at PageID.573-574). On December 16, 2015, Dr. Osman noted Plaintiff had been using a copper sleeve to help with his arm sensitivity. (*Id*. at PageID.601).

On February 12, 2016, Plaintiff returned to Dr. Shakkottai complaining of "worsened rotator cuff injury on the right side with a complete tear," which had caused Plaintiff significantly more pain; Plaintiff went back on Lyrica because he noted it controlled his pain "reasonably well." (*Id*. at PageID.512). The physical exam findings included motor strength at 5 out of 5 for upper and lower extremities; sensation reduced

over the lateral border of the anterior forearm on the right as well as over the deltoid; normal coordination; reflexes 2+ in upper and lower extremities; and gait was narrow-based. (*Id.* at PageID.513). Dr. Shakkottai noted Plaintiff's neurologic symptoms had not changed since 2013 but that his pain was more prominent because of his rotator cuff tear. (*Id.*).

On June 1, 2016, Plaintiff saw Dr. Osman, who noted Plaintiff's appearance was alert, well-dressed, well-groomed, relaxed; his behavior was cooperative, agitated, attentive, and he maintained eye contact; his mood was euthymic, and his affect was appropriate; and his thoughts were organized and coherent and he was well oriented to reality. (*Id.* at PageID.602).

In November 2016, Plaintiff returned to Dr. Osman, who noted Plaintiff's appearance was alert, well-dressed, well-groomed, relaxed concerned, worried; his behavior was cooperative, patient, calm, and he maintained eye contact; his mood was euthymic, and his affect was appropriate; and his thoughts were organized and coherent and he was well oriented to reality. (*Id.* at PageID.605).

On January 27, 2017, Plaintiff returned to NP Weaver; the physical examination showed he had normal gait, a normal spine, and was oriented to person, place, and time. (*Id.* at PageID.577-578). On February 24, 2017, Plaintiff returned to Dr. Shakkottai complaining of worsened pain in his right shoulder and "more significantly new pain around the left shoulder." (*Id.* at PageID.514). Plaintiff had ceased taking Lyrica due to its side effects of drowsiness and sedation; he noted he could "live with the pain." (*Id.*). The physical exam showed 5 out of 5 strength in upper and lower extremities; reduced sensation

14

over Plaintiff's right deltoid; paresthesias over his left deltoid; normal coordination; absent reflexes at the biceps and brachioradialis, 3+ at the knees, 3+ at the ankles with "a few beats of ankle clonus"; and his gait was narrow-based with a good arm swing. (*Id*. at PageID.515).

On March 6, 2017, a cervical and thoracic spine MRI showed degenerative disc disease in the thoracic spine; mild diffuse narrowing of the cervical canal; and disc height loss and desiccation were most prominent in the mid cervical spine with associated bulges seen encroaching on the thecal sac and neural foramina. (*Id*. at PageID.522). Minor degenerative changes were seen elsewhere throughout Plaintiff's cervical and thoracic spine. (*Id*. at PageID.523). On March 7, 2017, Plaintiff saw NP Weaver and complained of hypertension; the review of systems indicated he had difficulty sleeping and the physical exam notes indicated that he was obese. (*Id*. at PageID.581-582).

Plaintiff paid a visit to Dr. Michael Yee on March 30, 2017, complaining of worsening pain that was a "baseline ache that is more painful with use of the arm." (*Id*. at PageID.516). Plaintiff reported he did not have pain that kept him up at night; he limited the use of his right arm due to pain and had weakness and popping in his right arm. (*Id*.). He also had baseline numbness and tingling down his medial right forearm to his thumb, which was consistent with his history of radiculopathy. (*Id*.). Plaintiff noted he had not been doing any physical therapy or strengthening on his right shoulder and that he had not had any shoulder injections. (*Id*.). Dr. Yee noted that Plaintiff had "excellent range of motion and no evidence of pseudoparalysis," and that he did not recommend a reverse total shoulder arthroplasty because Plaintiff's "range of motion [was] excellent and surgery

15

would improve his pain while worsening his motor function." (*Id*.). Thus, Dr. Yee recommended physical therapy. (*Id*). The same day, Plaintiff saw Dr. Bedi for a shoulder radiograph, which showed on the right shoulder chronic widening of the acromioclavicular interval, humeral head riding high, moderate osteoarthrosis of the glenohumeral joint; on the left shoulder, moderate acromioclavicular osteoarthrosis, congruent glenohumeral joint, and preserved acromiohumeral distance. (*Id*. at PageID.527).

## 2.    Function Reports

### i.    Plaintiff's Function Report

Plaintiff filled out a function report on May 5, 2015. (ECF No. 10 at PageID.329-336). In it, he reported that he lived in a house with family. (*Id*. at PageID.329). He explained that his conditions limited his ability to work because he was in "severe pain every minute of every day" and unable to lift; bending over, walking, or any movement irritated his neck, right arm, and right shoulder. (*Id*.). He noted that his depression and anxiety made it "impossible to do anything that require[d] [him] to think or make decisions." (*Id*.). He reported that his headaches were so bad he had to be in "complete darkness" and he could not tolerate noise; his headaches occasionally made him vomit. (*Id*.). Plaintiff also noted he was "always fatigued" and had "no energy." (*Id*.).

On a typical day, Plaintiff took his son to school and spent most of the rest of the day in bed; he sometimes did chores. (*Id*. at PageID.330). He cared for his 13-year-old son and small dog; sometimes his mother and sons helped him feed and walk his dog. (*Id*.). Plaintiff noted the activities he could no longer do as a result of his impairments: "running, baseball, work, daily chores, roller coasters, go[ing] out with friends, coach[ing] his son's

16

baseball team, anything physical or strenuous." (*Id*.). He further noted that his conditions affected his sleep in that he was in "constant pain," tossed and turned, and was irritable. (*Id*.).

Regarding personal care, Plaintiff reported his conditions affected his ability to dress himself because he had a hard time lifting his arms to dress or bend over; he had difficulty bathing, caring for hair, shaving, feeding himself, and using the toilet because he could not use or lift his arms well and doing so caused pain. (*Id*.). He noted that his arm, neck, and shoulder pain also affected his abilities to remove snow, do lawn care, brush his teeth, and take out garbage. (*Id*.). He needed help and reminders to cut his hair, clean the house, do dishes, and do laundry; he noted he needed "lots of notes and lists." (*Id*. at PageID.331). Additionally, his mother sent him texts and called him with reminders to take his medicine. (*Id*). Plaintiff prepared his own food, typically, sandwiches, frozen dinners, and microwavable foods. (*Id*.). He noted he tried to prepare meals everyday but could not do it most of the time and that it took him extra time to do so because he was unable to stand for long periods. (*Id*.). His cooking habits had changed since his condition began in that he ate more frozen dinners and his mother cooked for him more than usual. (*Id*.). He attempted to do chores, but mostly relied on help from his mother and children; the time it took him to do chores varied—sometimes hours—because he needed many breaks. (*Id*.). He went outside a couple times a day; he noted that severe pain and fatigue prevented him from going out more. (*Id*. at PageID.332). When he went out, Plaintiff drove or rode in a car; he could go out alone. (*Id*.). When he shopped, he did so in stores and online; he shopped once a week for about two hours. (*Id*.). Plaintiff could not pay bills, handle a

17

savings account, or use a checkbook; he noted that his mother paid his bills and handled his money. (*Id*.). He reported that his ability to handle money had changed since the onset of his conditions in that he had no money and had to depend on others to pay for him. (*Id*. at PageID.333).

His hobby was watching television, which he noted was "all [he] c[ould] do." (*Id*.). His conditions made it difficult for him to follow what was going on in a television show. (*Id*.). Plaintiff spent time with his friends and family when they came to visit; he tried to spend as much time with them as possible, depending on the level of his pain. (*Id*.). He went to church every Sunday; he did not need reminders to go places or someone to accompany him. (*Id*.). Plaintiff reported no problems getting along with friends, family, neighbors, or others; his illness affected him socially in that he rarely felt well and therefore stayed home most of the time. (*Id*. at PageID.334).

Plaintiff noted that his impairments affected his abilities to follow instructions, understand, complete tasks, concentrate, lift, bend, squat, reach, walk, sit, kneel, hear, climb stairs, and use his hands. (*Id*.). He reported that he could only lift 15 pounds and that performing activities with his condition affected his neck, shoulder, and right arm. (*Id*.). He noted that he was righthanded. (*Id*.). He could walk one block before having to stop and rest for 5 to 10 minutes. (*Id*.). He noted that he could pay attention for 30 minutes before the pain "t[ook] over." (*Id*.). He did not finish what he started and he was "ok" at following written and spoken instructions. (*Id*.). He got along well with authority figures and had never been fired or laid off from a job because of problems getting along with others. (*Id*. at PageID.335). He did not handle stress well and he noted he handled changes in routine

18

"fine." (*Id.*). He expressed fear that he did not know how he would take care of himself once his children grew up or if something happened to his mother. (*Id.*).

Plaintiff experienced weight gain, depression, and unusual thoughts as side effects of Lyrica and constipation as a side effect of Norco. (*Id.* at PageID.336).

### ii.    Third Party Function Report

Plaintiff's mother, Nancy Chamberlin, completed a third-party function report on May 6, 2015. (ECF No. 10 at PageID.341). In it, Chamberlin noted that she saw Plaintiff three or four times per week for family time. (*Id.*). He lived in a house with his family; she noted that his constant pain affected his ability to work. (*Id.*). On a typical day, she noted, Plaintiff watched television, spent time with his friends, and took care of his son. (*Id.* at PageID.342). Chamberlin helped Plaintiff with his meals and laundry. (*Id.*). She reported that activities Plaintiff could no longer do since his illness included working, hunting, and fishing. (*Id.*). His pain affected his sleep. (*Id.*). She noted that Plaintiff had no problems with personal care and did not need help or reminders to take medicine or to take care of his personal needs. (*Id.* at PageID.342-343). He prepared his own meals two or three times each week and spent about half an hour doing so each time. (*Id.* at PageID.343). Chamberlin noted that since the onset of Plaintiff's disability he spent less time preparing food because of his pain. (*Id.*). He needed help with all his chores. (*Id.*). Chamberlin noted that Plaintiff drove or rode in a car when he went out and did not need accompaniment; he shopped in stores for groceries and personal items. (*Id.* at PageID.344).

She reported that Plaintiff was able to pay bills, count change, handle a savings account, and use a checkbook; his ability to handle money had not changed since the onset

of his conditions. (*Id*. at PageID.344-345). Plaintiff's hobbies were hunting, fishing, sports, and watching television, but since the onset of his conditions, he could only watch television. (*Id*. at PageID.345). Plaintiff spent time with others in person and on the phone. (*Id*.). Regarding social and community involvement, Plaintiff attended church each Sunday and went to his son's baseball games; he neither needed reminders to attend nor did he need someone to accompany him. (*Id*.).

Chamberlin further noted that Plaintiff had no problem getting along with others but had lost interest in a lot of social activities since the onset of his conditions. (*Id*. at PageID.346). Plaintiff's condition affected his memory and his abilities to lift, squat, bend, stand, reach, walk, sit, kneel, hear, complete tasks, concentrate, and use his hands. (*Id*.). Chamberlin reported Plaintiff finished what he started and that he followed written and spoken instructions "well." (*Id*.). Moreover, she noted that Plaintiff got along well with authority figures and had never been fired from a job because of problems getting along with others. (*Id*. at PageID.347). Chamberlin opined that Plaintiff did not handle stress very well and that he handled changes in routine "ok." (*Id*.). She had not noticed any unusual behavior or fears in Plaintiff and noted that he did not use any mobility aids. (*Id*.). She reported that Plaintiff took Lyrica, Adderall, Zoloft, and Prilosec and that Plaintiff experienced the side effect of depression from Lyrica. (*Id*. at PageID.348).

### 3.    Administrative Hearing

#### a. Plaintiff Testimony

Plaintiff testified that had not worked since December 2012. (ECF No. 10 at PageID.104). He had not made any effort to search for or apply for jobs since then, nor had

he done any volunteer work, training or classes. (*Id.* at PageID.105). He testified that he had been paid by Michigan Works to attend classes but had not attended them because he felt he could not physically sit through them—thus, Michigan Works ceased paying him. (*Id.* at PageID.106).

Plaintiff had previously been self-employed, during which time he performed manual work and eventually managed. (*Id.* at PageID.109). Prior to the onset of his conditions, he lifted over 100 pounds at work; when he managed, he lifted "less than a pound" because most of his work was paperwork. (*Id.*). While he managed, he alternated between sitting and standing during work, and he could stand whenever he wanted. (*Id.*).

In 2008, Plaintiff spent a few months working for O'Ryan Management installing fire alarms and wiring security cameras while his business was slow; he had no prior experience with this type of work. (*Id.* at PageID.110-111). During his employment at O'Ryan, Plaintiff spent most of his work hours standing, walking, and climbing; he pulled wires, climbed, and carried ladders, and lifted up to 50 pounds. (*Id.* at PageID.111). Between 2001 and 2003, Plaintiff reported earnings from his mother, Nancy Chamberlin, doing insurance construction work for her business and managing garbage workers. (*Id.* at PageID.112-113). After his father passed away in 2003, Plaintiff started his own business, Chamberlin Builders, LLC; he did most of the same work he had done for his mother but sometimes hired subcontractors. (*Id.* at PageID.113).

The ALJ then transitioned to asking Plaintiff about his medical history. (*Id.* at PageID.114). In 2015, Plaintiff had been treated by Dr. Ciullo, who had performed two surgeries on Plaintiff's shoulder previously; Plaintiff had been considering another surgery

to repair his rotator cuff, but Dr. Ciullo opined that Plaintiff had to reach a certain weight before proceeding. (*Id*.). He then went to University of Michigan medical center, where the physicians discouraged surgical repair of Plaintiff's rotator cuff. (*Id*.). Plaintiff further testified that he sought a medical opinion about whether the pain in his left shoulder had been caused by his Arnold Chiari; he was told that shoulder surgery may reduce some of the pain caused by structural damage in his shoulder, but that there was no surgical option that could fix the nerve damage the Arnold Chiari had caused in his neck. (*Id*. at PageID.115).

Plaintiff noted at the hearing that he had an upcoming appointment with an orthopedic surgeon in September because, although doctors had previously told him he was too young for surgery, Plaintiff felt he could no longer stand the pain. (*Id*.). The ALJ confirmed with Plaintiff that the University of Michigan physician noted on March 30 that surgical treatment, if any, should be "limited to reverse total shoulder arthroplasty" but that they did not recommend it at the time because it would improve Plaintiff's pain while worsening his motor function. (*Id*. at PageID.116). The ALJ then inquired about Plaintiff's mental health treatment. (*Id*.). Plaintiff noted that he saw his psychiatrist, Dr. Osman, every six months. (*Id*.). He took Zoloft, Adderall, and Prilosec, which he felt were helpful. (*Id*. at PageID.116-117).

Then, Plaintiff's attorney proceeded to ask him questions. (*Id*. at PageID.117). Plaintiff started by describing the pain between his back and shoulder as well as some of his medical history. (*Id*.). He noted the pain in his upper right shoulder and upper part of his arm started when he was 19. (*Id*.). After eliciting opinions from many doctors, Plaintiff

was informed that he had an Arnold Chiari malformation, which he described as a birth defect in which the base of his brain had grown into his spinal column. (*Id*.). In 1996, Plaintiff had a decompression procedure performed, which ne noted made him feel "a little bit better"; he continued to work and although he thought the pain was subsiding, "it just never really seemed to ever go away." (*Id*.). Then, Plaintiff noted, he began experiencing pain, numbness, and tingling in his shoulder joint area. (*Id*.). He elicited opinions from more doctors, neurologists, and orthopedic surgeons. (*Id*. at PageID.118). He recalled that Dr. Fields performed the first surgery on his neck in 1996; Dr. Fields opined that Plaintiff's two principle issues were his Arnold Chiari malformation causing nerve damage in his upper extremities and a structural defect in his shoulder. (*Id*.). Plaintiff had a second surgery and, like he noted about the first, the pain never subsided. (*Id*.). After losing his insurance, Plaintiff noted he "dealt with the pain and just kept working." (*Id*.). Plaintiff noted that in 2009, he noticed that his arm was "paralyzed by maybe 85 percent"; he elicited a physician's opinion and was informed that the numbness was not related to his Arnold Chiari malformation. (*Id*.). Plaintiff went back to the University of Michigan medical center and underwent more tests, wore a sling for three months, and noted that although he got some motion in his arm back, the pain was so bad that in 2010 he ceased physical activity. (*Id*. at PageID.118-119). He noted that because he had little strength and motor capability, his brother-in-law took over most of the day-to-day physical activities around Plaintiff's business. (*Id*. at PageID.119). In 2012, Plaintiff's pain had gotten to a point where he felt he could not continue working; his depression, stress, and ability to deal with others had worsened, and he closed his business. (*Id*.). He reported that his conditions have

since gotten worse. (*Id*.).

Plaintiff further noted that he had pain in his right arm and shoulder that persisted throughout each day. (*Id*. at PageID.120). He described the pain as "somebody sticking a screwdriver between [his] shoulder joint and trying to pop it out." (*Id*.). He was righthanded but had limited use of his right hand; it shook so much that he could barely text or hold his hand out. (*Id*.). He testified that the pain from his shoulder went all the way down his right arm. (*Id*.). He also experienced tingling, numbness, and stiffness in his neck and that "something will pop and [his] neck will be [*sic*] messed up for a week or so." (*Id*.). Further, Plaintiff testified that he had experienced numbness, tingling, and pain in his left shoulder as well. (*Id*.).

Plaintiff then reported that he had Carpal Tunnel in both hands. (*Id*. at PageID.120-121). He had surgery performed on his left hand, which he noted went "really well" and helped significantly. (*Id*. at PageID.121). He had not had surgery on his right hand because, being righthanded, he was apprehensive that the surgery could make his problem worse. (*Id*.). Then, Plaintiff discussed his headaches, which varied in frequency. (*Id*. at PageID.122). Sometimes, he noted, his headaches were so severe they made him vomit and sweat profusely; he had to go in a dark room to alleviate the pain. (*Id*.). He further noted that on occasion, his headaches were so severe that his mother had to care for him, but that he had not had a headache of this severity in the six months prior to the hearing. (*Id*.). Generally, he experienced headaches once a week and the average one lasted four or five hours. (*Id*.).

Aside from the surgery, Plaintiff noted he did very little to treat the pain in his right

shoulder and neck aside from sleep and rest; he had been taking Lyrica, which helped some of his nerve pain, but it caused side effects of more tiredness and leg twitching. (*Id*. at PageID.123). He laid in bed with his neck propped and back up on an angle for comfort; he could not put weight on his shoulder about four or five hours a day. (*Id*. at PageID.124). He reported that the pain was so bad that all he could do was lay in this position and watch television; his pain had been bad enough to limit his activities since late 2009. (*Id*.). Plaintiff testified that he was tired all the time; taking Adderall helped give him more motivation but he still lacked energy. (*Id*. at PageID.123). He reported that his sleep was normally "pretty good" and that he woke up at the same time every morning. (*Id*.).

Plaintiff noted he lived with his mother and son; his mother took care of him, did most of the housecleaning, and "95 percent of the cooking." (*Id*. at PageID.125). He could not do housework the way he used to; he could no longer mow the lawn. (*Id*. at PageID.126). He testified that his mother's medical conditions were worsening and that she was on oxygen. (*Id*. at PageID.125). His sister came over once a week to do his laundry. (*Id*.). He was able to take care of all of his personal needs by himself. (*Id*.). He did little during the day; his main activity was attending church on Sundays. (*Id*.). He reported that he had problems with concentration and focus, which were somewhat alleviated by the Adderall, but that he still could not finish what he started. (*Id*.).

He testified that he used to be very active and coach his sons' teams; he attributed his depression to his inability to be active with his sons because of his pain. (*Id*. at PageID.126). He noted he was being treated predominantly at University of Michigan; he saw an orthopedic surgeon and neurologist about every six months. (*Id*. at PageID.126-

25

127). He noted that his right arm was so sensitive that anything—even a gust of wind—
would cause him pain that radiated to his right shoulder; thus, he wore a copper sleeve to
protect his right arm from touch. (*Id.* at PageID.127). He testified that his right arm had
been very sensitive since late 2009 or early 2010. (*Id.*).

### b. Vocational Expert Testimony

The ALJ then asked the vocational expert (VE) to consider a hypothetical individual
the same age and education as the Plaintiff with same work experience who is

> [a]ble to lift and/or carry up to 10 pounds frequently and up of 20 pounds
> occasionally; is able to stand and/or walk for up to six hours and sit for up to
> six hours during a normal eight-hour workday. The hypothetical individual
> may frequently push, pull, operate hand controls and reach with the right
> upper extremity. However, the hypothetical individual should not reach
> overhead or to shoulder height with the right upper extremity. The
> hypothetical individual may occasionally climb ladders but may never climb
> ropes or scaffolds. The hypothetical individual may occasionally kneel,
> crouch and crawl. The hypothetical individual should interact with the public
> only occasionally. And the hypothetical individual is able to carry out simple
> instructions. Could such a hypothetical individual perform any of the past
> jobs you've described as actually performed or generally performed in the
> national economy.

(*Id.* at PageID.131-132). The VE replied that a hypothetical individual could not, based on
exertional levels with most of the work. (*Id.* at PageID.132). The ALJ presented the VE
with a second hypothetical:

> I would like you to consider a hypothetical individual of the same age and
> education as the claimant, with the past jobs you identified here in the
> hearing. Such a hypothetical individual was able to lift and/or carry no more
> than ten pounds at a time, and may occasionally lift or carry articles such as
> docket, files, ledgers and small tools. The hypothetical individual is able to
> stand and/or walk for six hours and sit for six hours during a normal eight-
> hour workday. The hypothetical individual may frequently push, pull and use
> hand controls, and reach with the right upper extremity. However, the

> hypothetical individual is unable to reach overhead or to shoulder height with the right upper extremity. The hypothetical individual may occasionally climb ladders, but may never climb ropes or scaffolds. The hypothetical individual may occasionally kneel, crouch and crawl, may have occasional interaction with the public and is able to carry out simple instructions. I'm assuming from the underlying hypothetical that past work is eliminated?

(*Id.* at PageID.135). The VE replied "that is correct." (*Id.*). The VE testified that a person fitting the hypothetical description could perform the following jobs: assembler, of which there were approximately 200,000 jobs in the national economy; an untitled position the VE described as "DOT code of 713.867-018, also SVP 2," of which there were approximately 200,000 jobs in the national economy; and yet another untitled position the VE described as DOT code 715.684-026, also sedentary and unskilled, of which there were approximately 200,000 jobs in the national economy. (*Id.* at PageID.136).

The Plaintiff's attorney then modified the hypothetical: "if we changed the push and pull with his right dominant hand to non, and we changed the reaching done with his right dominant hand to occasionally but at table height, how would that impact the type of jobs you've suggested?" (*Id.* at PageID.137). To which the VE responded that she could not find examples to fit that modified hypothetical scenario. (*Id.*). The attorney then asked if she were to "add to the hypothetical that he would be off task due to pain, fatigue, and other issues relating to his condition of more than 20 percent during the day, how would that impact the hypothetical question?" to which the VE replied that such a hypothetical individual would be inconsistent with being able to perform employment. (*Id.*). Finally, the Plaintiff's attorney asked, "if I were to add to that hypothetical that he would miss two or more days a month due to his health issues, predominantly the pain and problems with his

27

right upper extremity as well as his neck and headaches, how would that impact that hypothetical?" to which the VE replied that "someone in that hypothetical scenario would not be competitively employable." (*Id.*).

### F.    Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations[1] carve the evidence into "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513 (2016). "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a) (2016). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d) (2016). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).   Both   "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner,

---

[1] Various regulations were amended after the claim was filed. See, e.g., *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844-01 (January 18, 2017) (effective March 27, 2017). The governing regulations here, however, expressly apply to claims filed before March 27, 2017, like Plaintiff's. See 20 C.F.R. § 404.1527.

such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* § 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Because Plaintiff filed his claim before March 27, 2017, he is entitled to the benefit of the treating-source rule.  Under that rule, certain opinions from his treating physicians can receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2); *see also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(c)(2). Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d). Thus, the ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment

meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits must give specific reasons, supported by record evidence, for the weight granted to a treating source's opinion. *Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th Cir. 1995).

An ALJ must also analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p, 1996 WL 374186 (July 2, 1996).[2] Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling

---

[2] Although the Commissioner has rescinded SSR 96-7p and eliminated the term "credibility" from Administration policy, SSR 16-3p, 2016 WL 1119029, at *1 (Mar. 16, 2016), the underlying regulation has remained materially unchanged, *see* 20. C.F.R. § 404.1529(c), and I agree with the courts in this District that have continued to apply SSR 96-7p to cases arising prior to its rescission. *See, e.g., Cooper v. Comm'r of Soc. Sec.*, No. 16-cv-13477, 2017 WL 3923984, at *3 (E.D. Mich. August 21, 2017), *Rep. & Rec. adopted by* 2017 WL 3891971 (E.D. Mich. Sept. 9, 2017); *Tuttle v. Comm'r of Soc. Sec.*, No. 16-11144, 2017 WL 2928021, at *6 n. 3 (E.D. Mich. June 9, 2017), *Rep. & Rec. adopted by* 2017 WL 2905125 (E.D. Mich. July 7, 2017).

reason." *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529(a) (2016); SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996). The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529 (2016); SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996); *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996).

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3d Cir. 1984)) (internal quotation marks omitted), a claimant's description of his or her physical or mental impairments will "not alone establish that [he or she is] disabled." 20 C.F.R. § 404.1529(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1 (July 2, 1996). Instead, the absence of objective, confirming evidence forces the ALJ to consider various factors. 20 C.F.R. § 404.1529(c)(3) (2016); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994).

31

## G.    Analysis

Plaintiff presents four arguments, each of which I address in turn.

> ### i.    Plaintiff's argument that the ALJ was required to obtain a medical opinion in assessing limitations caused by Plaintiff's shoulder impairment

Plaintiff's first argument is that the ALJ's assessment was unsupported by substantial evidence because the ALJ failed to elicit the opinion of a medical expert when she promulgated the RFC. (ECF No. 12 at PageID.624). As Plaintiff notes, a Social Security ALJ has a "basic obligation to develop a full and fair record" as an inquisitorial adjudicator. (*Id.* at PageID.624-625 (*citing Wright-Hines v. Comm'r of Soc. Sec.*, 597 F.3d 392, 397 (6th Cir. 2010) (citations omitted); *Lashley v. Sec'y of Health & Human Servs.*, 708 F.2d 1048, 1051 (6th Cir. 1983)). Per 20 C.F.R. § 404.1545(a)(1), the RFC is the most one can still do despite his limitations and is assessed based on all relevant evidence in the case record. *Id.* The plaintiff generally has the burden of providing the evidence for the ALJ to develop the RFC. 20 C.F.R. § 404.1545(a)(3).

Plaintiff contests the portion of the ALJ's RFC that states Plaintiff could frequently push, pull, use hand controls, and reach with the right upper extremity and never reach overhead or to shoulder height with the upper right extremity. (ECF No. 12 at PageID.627 (*citing* ECF No. 10 at PageID.73)). The only evidence Plaintiff cites to this point is that Plaintiff "needed a reverse total shoulder arthroplasty, but was dissuaded by professionals who cited age and obesity," and he argues that it is "highly improbably that a layman could determine" what Plaintiff could do based on the complicated nature of Plaintiff's shoulder impairment. (*Id.* at PageID.627-628). Based on the evidence Plaintiff provided and the

32

evidence the ALJ cited, however, it appears the ALJ's conclusions were supported with substantial evidence.

The ALJ's conclusion that Plaintiff could lift and carry 10 pounds is based on a host of treatment notes indicating that Plaintiff had full range of motion in his upper extremities: on May 6, 2013, Plaintiff told Dr. Shakkottai that he remained physically active. The physical exam indicated that Plaintiff's motor strength was 5/5 in upper and lower extremities. (ECF No. 10 at PageID.419). Then on February 12, 2016, Plaintiff returned to Dr. Shakkottai and his physical exam findings included motor strength at 5 out of 5 for upper and lower extremities and reflexes 2+ in upper and lower extremities. (*Id*. at PageID.513). A year later in February 2017, Plaintiff returned to Dr. Shakkottai and the physical exam showed 5 out of 5 strength in upper and lower extremities. (*Id*. at PageID.515). Notably, Plaintiff told Dr. Shakkottai that he could "live with the pain." (*Id*. at PageID.514). Then on March 30, 2017, Dr. Yee noted that Plaintiff had "excellent range of motion" (*Id*. at PageID.517). Moreover, as the ALJ pointed out, Plaintiff reported in his function report that he could lift 15 pounds. (*Id*. at PageID.334). The RFC stipulation that Plaintiff could frequently use his right arm but could never reach overhead or to shoulder height is also consistent with the medical evidence from appointments in June 2013, January 2014, December 2014, June 2015, and March 2017. (*Id*. at PageID.400, 421, 481, 488, 492, 505, 517).

In support of the argument that the ALJ required a medical source to assess the RFC, Plaintiff cites a section of *Gross v. Comm'r of Soc. Sec*.: "there is significant case laws in this district confirming the general principle that the ALJ must generally obtain a medical

33

expert opinion when formulating RFC unless the medical evidence shows relatively little physical impairment such that the ALJ can permissibly render a common sense judgment about functional capacity." 247 F. Supp. 3d 824, 828-29 (E.D. Mich. 2017). Plaintiff's discussion of *Gross* is incomplete and glosses over caveats; as *Gross* notes further, "the social security statute does not contemplate a bright line rule requiring the ALJ to base his or her RFC finding on a physician's opinion." *Id.* at 829 (discussing 20 C.F.R. § 404.1527(d)). Further, as *Gross* clarifies, a reviewing court should look to whether the ALJ's decision "'provide[s] an accurate and logical bridge between the evidence and the result.'" *Id.* at 829-30 (*quoting Pollaccia v. Comm'r of Soc. Sec.,* No. 09-14438, 2011 WL 281044, at *6 (E.D. Mich. Jan. 6. 2011)). And, as Judge Linda Parker recently noted in *Woodard v. Saul*, No. 18-11099, 2019 WL 4565119, *4 (E.D. Mich. Sept. 20, 2019), *Gross* states that "there are likely instances in which an ALJ can formulate an RFC without the aid of opinion evidence." *Gross*, 247 F. Supp. 3d at 830.

Moreover, while Plaintiff cites a swath of cases from other Circuits, the Sixth Circuit has consistently and explicitly rejected the argument that an ALJ *must* elicit a medical opinion in promulgating an RFC. *See Gant-Holmes v. Comm'r of Soc. Sec.,* No. 18-cv-12264, 2019 WL 3282741, at *2-3 (6th Cir. July 22, 2019). *Tucker v. Comm'r of Soc. Sec.*, 775 Fed. App'x. 220, 226 (6th Cir. 2019) ("No bright-line rule exists in our circuit directing that medical opinions must be the building blocks of the residual functional capacity finding, but the administrative law judge must make a connection between the evidence relied on and the conclusion reached."); *Mokbel-Aljahmi v. Comm'r of Soc. Sec.*, 732 F. App'x 395, 401 (6th Cir. 2018); *Shepard v. Comm'r of Soc. Sec.*, 705 F. App'x 435, 442-

43 (6th Cir. 2017) (noting that an ALJ acted within her authority when she developed an RFC even though no medical source opined that the Plaintiff was capable of light work); *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013) ("the ALJ is charged with the responsibility of determining the RFC based on her evaluation of the medical and non-medical evidence").

This Court has also specifically rejected the notion that an ALJ's RFC is only valid if supported by a medical opinion. *See Charbonneau v. Comm'r of Soc. Sec.,* No. 2:18-cv-10112, 2019 WL 960192, at *17 (E.D. Mich. Jan. 11, 2019) (finding no "brightline rule that medical opinions must be the building blocks of the RFC"). *See also Balknight v. Comm'r of Soc. Sec.*, 18-11843, 2019 WL 4011881 (E.D. Mich. July 31, 2019).

Here, although Plaintiff contends the evidence about Plaintiff's range of motion are too complex to be understood by a layman, this court has recently opined that "full range of motion and normal strength are not complicated medical findings in need of expert interpretation." *See Callahan v. Comm'r of Soc. Sec.*, No. 17-14069, 2019 WL 2218825, at *9 (E.D. Mich. Feb. 4, 2019). The ALJ here linked the evidence of properly functioning arms and shoulders—discussed above—with the RFC. The fact that physicians may have considered, but ultimately rejected, a surgery does not complicate the picture enough to require an expert.

For these reasons, and because Plaintiff failed to carry his burden to prove otherwise, I am not persuaded by Plaintiff's argument that the ALJ erred in not eliciting a medical opinion in forming Plaintiff's RFC.

                  **ii.**        **Plaintiff's argument that the ALJ inadequately assessed**

**Plaintiff's subjective statements about the severity and limiting effects of his shoulder impairment**

Plaintiff's second argument is that the ALJ ignored the individual nature of Plaintiff's case by critiquing Plaintiff's use of conservative treatment instead of surgery and not thoroughly assessing Plaintiff's statements about his limitations. (ECF No. 12 at PageID.628-630). Specifically, Plaintiff notes that the ALJ did not consider Plaintiff's obesity and young age—the main reasons he continued conservative treatment. (*Id*. at PageID.629). Regarding Plaintiff's use of conservative treatment, the ALJ opined:

> Current treatment for this right shoulder impairment has been conservative. In the past, the claimant had two surgical procedures for his right shoulder ([ECF No. 10 at PageID.399]). The recent imaging described above showed rotator cuff tendon tear and widening of the right AC joint ([*Id*. at PageID.418, 420, 517]). Yet, the claimant has seen specialists who advised against a reverse total arthroplasty. They noted the claimant was much too active and still had good-to-excellent range of motion ([*Id*. at PageID.421, 517]). Instead one provider recommended the claimant undergo physical therapy ([*Id*. at PageID.517, 530]). In terms of other forms of treatment, the claimant noted that Lyrica controlled his pain reasonably well ([*Id*. at PageID.512]). The claimant also testified that he wears a sleeve on his right upper extremity because his skin is sensitive ([*Id*. at PageID.123]).

(ECF No. 10 at PageID.76). A few paragraphs later, the ALJ discussed the opinion of a specialist who told Plaintiff to wait another 8 to 10 years before considering a reverse total shoulder arthroplasty because Plaintiff was fortunate to have good range of motion. (*Id*. at PageID.77). In the following paragraph, the ALJ cites Plaintiff's June 2015 appointment in which a specialist told him he was too active and too young to talk about a reverse total shoulder arthroplasty; further, the ALJ noted, the specialist indicated that Plaintiff "would need to reduce his weight to 175 pounds or less before proceeding with this procedure." (*Id*.). A few paragraphs later, the ALJ discussed Plaintiff's obesity: "the claimant is obese

36

with a body mass index greater than 39 . . . the claimant's obesity does not affect his ability to ambulate effectively . . . and there is no evidence to show that the claimant's obesity precluded work activities altogether." (*Id.*).

Given the above abridgment of the ALJ's findings, it appears that Plaintiff mischaracterizes what the ALJ said; the ALJ did note that the reasons physicians recommended against surgery were his youth, his weight, range of motion, and his motor strength. The ALJ reiterated these medical findings accurately. And, contrary to Plaintiff's side complaint, the ALJ also explicitly considered the effects of obesity in developing the RFC.

With this in mind, this court has held that an ALJ may properly give a plaintiff's statements less weight when they choose conservative treatment. *See Echols v. Comm'r of Soc. Sec.*, Civ. No. 18-cv-12386, 2019 WL 3852528 (E.D. Mich. July 26, 2019) ("a claimant's receipt of only conservative treatment and non-compliance with prescribed treatment are also reasonable factors to consider in evaluating complaints of disabling pain"). *Abraham v. Comm'r of Soc. Sec.,* No. 18-12422, 2019 WL 5680809, at *8 (E.D. Mich. Aug. 17, 2019) (noting that an ALJ may rely on the plaintiff's conservative treatment in finding that his subjective complaints were not entirely credible).[3]

Thus, I am unpersuaded by Plaintiff's argument that the ALJ did not fully consider

---

[3] Plaintiff gestures toward another argument in a footnote, saying, "Note, the record also indicates that cost was an issue" with regard to the surgeries. (ECF No. 12 at PageID.630). It is true that a plaintiff's inability to afford more aggressive treatment undercuts an ALJ's reliance on conservative treatment. *See Houston v. Comm'r of Soc. Sec.*, No. 14–14426, 2015 WL 5752720, at *23 (E.D. Mich. Aug. 25, 2015), *rep. & rec. adopted by* 2015 WL 5729079 (E.D. Mich. Sept. 30, 2015). But Plaintiff fails to put any flesh on this argument and therefore has forfeited it. *Jones Bros., Inc. v. Sec'y of Labor*, 898 F.3d 669, 677 (6th Cir. 2018) (noting that the Sixth Circuit has "repeatedly held that a party forfeits any allegations that lack developed argument").

the individual nature of Plaintiff's conservative treatment and I conclude that the ALJ was proper and supported by substantial evidence.

### iii. Plaintiff's argument that the ALJ failed to assess a mental RFC that accounts for her own Step Three Assessment

Plaintiff's third argument is that the ALJ's RFC and hypothetical to the VE did not adequately account for Plaintiff's moderate limitation in concentration, persistence, or pace (CPP), which the ALJ found at step three, (ECF No. 10 at PageID.72). (ECF No. 12 at PageID.630-632). The RFC and hypothetical, however, only limited Plaintiff to occasional interaction with the public and carrying out simple instructions. (ECF No. 10 at PageID.73, 135). He cites out-of-Circuit caselaw for the proposition that a limitation to "simple, repetitive work" does not accommodate a finding of moderate limitations in CPP. (ECF No. 12 at PageID.631 (*citing inter alia Brink v. Comm'r of Soc. Sec.*, 343 F. App'x 211, 212 (9th Cir. 2009)).

Plaintiff is correct that courts have found a limitation to unskilled or simple work did not properly account for an ALJ's finding of moderate limitations in CPP. The reason is that the limitation to simple work focuses on the complexity of the task, not the "frequency of how often the person can concentrate." *Brown v. Comm'r of Soc. Sec.*, 672 F. Supp. 2d 794, 797 (E.D. Mich. 2009). In other words, "[t]here may be cases where . . . moderate limitations [in CPP] preclude the performance of even some simple, unskilled tasks." *Lewicki v. Comm'r of Soc. Sec.*, 2010 WL 3905375, at *3 (E.D. Mich. Sept. 30, 2010).

But "there is no bright-line rule requiring remand whenever an ALJ's hypothetical includes a limitation of 'unskilled work' but excludes a moderate limitation in concentration. Rather, this Court must look at the record as a whole and determine if substantial evidence supports the ALJ's decision." *Zizzo v. Comm'r of Soc. Sec.*, 2013 WL 5291663, at \*13 (E.D. Mich. Sept. 19, 2013) (*quoting Taylor v. Comm'r of Soc. Sec.*, 2011 WL 2682682 at \* 7 (E.D. Mich. 2011), *rep & rec. adopted by* 2011 WL 2682892 (E.D. Mich. 2011)). Under this reasoning, many cases have rejected claims of error in these circumstances when "a medical professional determined that the claimant suffered from limitations in CPP or was otherwise limited to simple, routine, repetitive tasks." *Ervin v. Comm'r of Soc. Sec.*, 2017 WL 955129, at \*3 (E.D. Mich. Mar. 13, 2017) (collecting cases). More specifically, the "cases within this District that do not remand for the ALJ to include a moderate concentration, persistence, or pace limitation were distinguishable [from those that do remand] because a medical professional had made a specific finding that the claimant had moderate difficulties in concentration, persistence, or pace, but could still work on a sustained basis." *Cwik v. Comm'r of Soc. Sec.*, 2012 WL 1033578, at \*10 (E.D. Mich. Feb. 23, 2012), *rep. & rec. adopted by* 2012 WL 1033527 (E.D. Mich. Mar. 27, 2012); *see also Hicks v. Comm'r of Soc. Sec.*, 2011 WL 6000714, at \*8 (E.D. Mich. Aug. 30, 2011) ("[T]here is a line of CPP cases within this District that do not remand for the ALJ to include a 'moderate' CPP limitation where a medical professional makes a finding that the claimant has 'moderate' difficulties in CPP (e.g., on a Psychiatric Review Technique Form) but ultimately concludes that the claimant can work." (collecting cases)), *rep. & rec. adopted by* 2011 WL 6000701 (E.D. Mich. Nov. 28, 2011).

*Zizzo*, for example, noted that the ALJ's limitation to unskilled, simple, and non-production work was proper because medical sources had issued the same opinion and the plaintiff "simply does not address why the limitation . . . is not adequate in this case." 2013 WL 5291663, at *13. Similarly, in *Lewicki*, a "psychologist diagnosed moderate mental impairments, but also concluded that Plaintiff's mental limitations would not prohibit him from performing simple, unskilled work." 2010 WL 3905375, at *3. Accordingly, the court found that the ALJ adequately accounted for the plaintiff's impaired concentration, persistence, and pace. *Id.*; *see also Carlin v. Comm'r of Soc. Sec.*, 2013 WL 639338, at *7 (E.D. Mich. Jan. 11, 2013) (finding that a limitation to simple/routine work was sufficient despite moderate limitations in CPP because medical sources made the same findings in their opinions), *rep. & rec. adopted by* 2013 WL 639147 (E.D. Mich. Feb. 21, 2013).

Courts have also declined remanding when a medical source found that moderate difficulties with CPP did not prevent the plaintiff from completing one- to two-step tasks on a sustained basis. *See Sutherlin v. Comm'r of Soc. Sec.*, 2011 WL 500212, at *2-3 (E.D. Mich. Feb. 8, 2011); *Stokes v. Comm'r of Soc. Sec.*, 2010 WL 4063886, at *11 (E.D.Mich. July 23, 2010) *adopted by* 2010 WL 4063744 (E.D. Mich. Oct. 14, 2010).

Here, the ALJ's step-three analysis referenced Plaintiff's mental impairment of attention deficit disorder when determining that Plaintiff had a moderate limitations in CPP. (ECF No. 10 at PageID.72, (*citing id.* at PageID.473)). She noted Plaintiff's subjective complaints of decreased concentration and that he mentioned being unable to follow television programs in his function report. (*Id.*, (*citing id.* at PageID.432-434, 480, 333)). The ALJ then discussed the fact that Plaintiff regularly attended church and his son's

sporting events. (*Id*. (*citing id*. at PageID.333, 345)). Moreover, the ALJ addressed the fact that Plaintiff took Adderall, which he specifically reported helped him concentrate. (*Id*., (*citing id*. at PageID.498, 433)). Additionally, the ALJ noted that mental status examinations consistently showed that Plaintiff's cognition was within normal limits. (*Id*., (*citing id*. at PageID.437, 594, 596, 598, 600, 605)). Then, the ALJ noted that Plaintiff was able to complete the sensorium and mental capacity portion of his June 2015 consultative examination without difficulty; she referenced that fact that Plaintiff could do the following: repeat five digits forward and three backwards, recall three objects after a period of five minutes, accurately perform serial sevens from 100 to two with moderate speed, and accurately perform mathematical calculations. (*Id*., (citing *id*. at PageID.501)).

Later in her decision, the ALJ reiterated and elaborated on this evidence. (*Id.* at PageID.78-79). In addition, she noted the opinion of Dr. Smith, who concluded that Plaintiff had moderate limitations in CPP but could complete one- to two-step tasks on a sustained basis. (*Id.* at PageID.80). The ALJ's conclusion was that Plaintiff's moderate limitations in CPP limited him to carrying out simple instructions. (*Id.* at PageID.79).

As such, the ALJ relied on the opinion of a medical source in determining that Plaintiff could complete work with simple instructions despite Plaintiff's moderate difficulties in CPP. This brings the ALJ's decision in line with the cases above that do not order remand. *See, e.g.*, *Sutherlin*, 2011 WL 500212, at *2-3; *Lewicki*, 2010 WL 3905375, at *3. Moreover, unlike a blanket limitation to simply work, it could be argued that the limitation to simple instructions does more to account for CPP issues as it limits the attention required for any task, although it would not limit the frequency of the task. In any

event, the ALJ also thoroughly canvassed the evidenced. Consequently, ALJ did not err in finding that Plaintiff had no more than a moderate limitation in concentration, persisting, or maintaining pace but could complete simple instructions.

Plaintiff's argument here also relies on *Ealy v. Comm'r of Soc. Sec.*, which held that in order for a VE's testimony in response to a hypothetical to serve as substantial evidence, the question must accurately portray the plaintiff's physical and mental impairments. 594 F.3d 504, 516 (6th Cir. 2010). *Ealy* is distinguishable, however, in that one of the Plaintiff's physicians had explicitly stipulated that Plaintiff had the mental ability to "1) understand and remember simple instructions; 2) sustain attention to complete simple repetitive tasks for two-hour segments over an eight-hour day where speed was not critical." *Id*. at 515-516. The Sixth Circuit has clearly distinguished *Ealy* from cases like the present. In *Kepke v. Comm'r of Soc. Sec*, the court noted that "*Ealy* is distinguishable from Kepke's case, however, because there, one of the claimant's doctors specifically limited his ability to sustain concentration to "simple repetitive tasks [for] '[two-hour] segments over an eight-hour day where speed was not critical.'" 636 F. App'x 625, 635 (6th Cir. 2016). Moreover, *Smith-Johnson v. Comm'r of Soc. Sec*. similarly distinguishes *Ealy*, noting that unlike the claimant in *Ealy*, the Plaintiff's physician "did not place any concrete functional limitations on her abilities to maintain attention, concentration, or pace when performing simple, repetitive, or routine tasks. Instead, [the source] plainly determined that Smith–Johnson could perform simple tasks on a 'sustained basis,' even considering her moderate limitations in maintaining concentration and persistence for 'extended periods.'" 579 F. App'x 426, 436-37 (6th Cir. 2014). This court also distinguished *Ealy* when medical source

42

opinions are not as restrictive as the examiner's in *Ealy*. *See, e.g., Madajski v. Comm'r of Soc. Sec.* No. 12–10656, 2013 WL 1211904 (E.D. Mich. 2013); *Seach v. Comm'r of Soc. Sec.*, Civ. No. 10–11741, 2011 WL 1792666, at *8 (E.D. Mich. 2011).

As noted, Plaintiff's brief identifies no evidence comparable to that in *Ealy* to provide for specific limitations on his ability to maintain concentration, persistence, or pace while doing simple work. Nor does the record contain such evidence. Consequently, I am unconvinced that the ALJ insufficiently conveyed Plaintiff's concentration limitations to the VE in her hypothetical or failed to accommodate them in her RFC.

### iv.    Plaintiff's argument that the ALJ lacked authority under the Appointments Clause

Plaintiff argues that his claim should be remanded for a *de novo* administrative hearing with a different ALJ pursuant the Supreme Court's recent ruling in *Lucia v. S.E.C.*, 138 S.Ct. 2044 (2018). (ECF No. 12 at PageID.632). In *Lucia*, the Supreme Court held that SEC ALJs were Officers of the United States—meaning their appointment had to be made by the President under the Appointments Clause rather than by the SEC. 138 S. Ct. at 2049. Plaintiff asserts that the ALJ here was improperly appointed and that he deserves a remand as a consequence.

Even assuming, *arguendo*, that the ruling in *Lucia* extends to ALJs of the Social Security administration, Plaintiff's constitutional challenge here should be rejected because it was not timely. The Court in *Lucia* specifically noted that a party must make "a *timely* challenge to the constitutional validity of the appointment of an officer who adjudicates his case" to be entitled to relief. 138 S. Ct. at 2055 (emphasis added).  Plaintiff cites a handful

of out-of-Circuit cases that hold Social Security applicants did not forfeit their Appointment Clause challenges by failing to raise them at the agency level. (ECF No. 12 at PageID.634). However, it appears that most courts, including this one, have held otherwise. *See Gothard v. Comm'r of Soc. Sec.*, 2018 WL 7254254 (E.D. Mich. Oct. 10, 2018) ("[M]any, if not all, post-*Lucia* decisions have rejected the argument that [Supreme Court caselaw] or some other rationale absolves the claimant's failure to raise the Appointments Clause at the agency level . . . ." (collecting cases)), *rep. & rec. adopted by* 2019 WL 396785 (E.D. Mich. Jan. 31, 2019); *see also Fortin v. Comm'r of Soc. Sec.*, 372 F. Supp. 3d 558, 567 (E.D. Mich. 2019) ("[T]he Court must respectfully disagree with the magistrate judge's suggestion that Social Security claimants, including the plaintiff here, have no obligation to raise and exhaust Appointments Clause challenges at the administrative level before seeking judicial review. Other courts overwhelmingly agree . . . ." (collecting cases)). Plaintiff's out-of-Circuit caselaw does not convince me to reject the "overwhelming[]" authority to the contrary.

Plaintiff waited until filing a Motion for Summary Judgement (ECF No. 12) to raise an objection to the administrative decision on constitutional grounds. Consequently, I conclude that Plaintiff forfeited the argument by failing to raise it below.

### H.    Conclusion

For these reasons, I conclude that substantial evidence supports the ALJ's decision. Consequently, I recommend **DENYING** Plaintiff's Motion, (R. 12), **GRANTING** the Commissioner's Motion, (R. 16), and **AFFIRMING** the Commissioner's final decision denying benefits.

## III.   <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

45

Date: January 31, 2020                              S/ PATRICIA T. MORRIS
                                                    Patricia T. Morris
                                                    United States Magistrate Judge


## **CERTIFICATION**

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: January 31, 2020                              By s/Kristen Castaneda
                                                    Case Manager

46